Good afternoon your honors and may it please the court. My name is Denisha Bacchus and alongside my colleague Gregory Dubinsky. I am pro bono appointed counsel for petitioner Mohamed Rousseau. I understand from your deputy that rebuttals are not the default in the motion context. So if I may, I'd like to request one minute for rebuttals. You can have one minute. That means you're only going to get four for your main argument, but go ahead. Understood your honor. So thank you your honors. This emergency motion asks two simple questions. Whether Mr. Rousseau raises substantial claims and whether extraordinary circumstances justify his release. If you answer both questions affirmatively, then you should exercise your authority to release him. On the first question, the government doesn't dispute that Mr. Rousseau raises substantial claims, which we preview in this motion and will brief in full in our forthcoming petition. The second question on whether extraordinary circumstances justify his release comes out in our favor. There can be no doubt that we live in extraordinary times, evidenced in part by our discussing this motion by phone. But it is not just the pandemic and its effects on normal life that make these circumstances extraordinary. It is Mr. Rousseau's severe medical vulnerabilities, among them his long-term use of an immunosuppressant medication and his symptoms. There are many of these applications now. We're getting them in the criminal context. The facilities do seem to do better. They're doing better. And so just from a couple of months ago, I mean, the numbers are down. So is it still such a great emergency? It is, Your Honor. And to be clear, we applaud all efforts to make the Buffalo facility safer for the average detainee. But the point is that Mr. Rousseau is not the average detainee. He is a medical. Let me question you about that, because I'm familiar with these corticosteroids that are used for allergies, because I have a number of family members who use them. GERD, you also, the gastroesophageal reflux, chronic cough, exercise-induced asthma, all seem to be relatively, you know, common ailments. This is not something like lupus or cancer that has been diagnosed. These are chronic conditions that are found widely in the general population. The government argues, and I guess he's had one cold, a respiratory infection while in immigration detention. Are you confident that these are really the seven people in the prison population that they would distinguish Mr. Rousseau just on their own? I mean, there may be other aspects of his circumstances, having been held for so long, for example, that make his case extraordinary. But I do wonder about your reliance so heavily on his use of the corticosteroids, as well as his other relatively minimal conditions, in my experience. And by the way, you have one minute left of your four minutes. Go ahead. All right. Sorry I used your time. No problem, Your Honor. So, Dr. Keller, a medical expert with over 20 years of expertise in diagnosis and treating people and also in work alongside ICE, has opined that Mr. Rousseau's particular medical conditions, and that does include both his long-term immunosuppressant use and his weight and all of these. And his depression, anxiety, his long-term detention in the facility, that all together combined these various conditions add to his specific medical vulnerability to coronavirus. That is the point. We are not arguing that any one separately would necessarily affect, would be enough, but we do believe that combined, and we have evidence both here and in the CDC guidelines, that these conditions affect his vulnerability. On the CDC guidelines, Your Honor, the CDC does recognize that immunosuppressant use, excuse me, that corticosteroid use does lead to immunosuppression. And so that is respectfully what we put forward on the relevance of the immunosuppressant medication. If I may just very briefly, I'd just like to quickly address the government's extraordinary attempt last night to put forward a new medical declaration in reply to our argument. I think it probably goes without saying that you cannot surprise the court and your opponent with new evidence on the oral argument. I haven't seen it. Something was filed last night? It was, Your Honor. At 6.58 p.m. last night, the government attempted to amend its medical declaration. And what we contend is an almost a concession of our points on their, of our challenges to their medical deposition. All right, we'll find it and take a look at it, but we'll hear from the government. Good afternoon, Your Honor. Sarah Pergolese for the government, and may it please the court. I'd like to start very quickly with the various CDC guidelines that the petitioner has cited in support of her claim that Rosalyn's use of corticosteroids puts him at risk. Those exact CDC guidelines actually say, and I quote, that the use of oral or intravenous corticosteroids may affect a patient's immune system. Could you speak a little more slowly, please? Yes, I'm sorry. I only have five minutes. I'm so sorry. That doesn't help. So I'd just like to very quickly point the court to the CDC guidelines that the petitioner cite explicitly as saying that Mr. Rosal's use of these corticosteroids, that he takes the nasal spray, which is a localized corticosteroid, affects his immune system and puts him at greater risk. The CDC guidelines explicitly describe corticosteroid use as a risk factor in saying, and I quote, the use of oral or intravenous corticosteroids or other medications causing immunosuppression can put a patient at risk of an affected immune system. And so the CDC guidelines that the petitioner cites themselves, they're actually not prohibitive of the claim that they're making. That is that this localized steroid, which acts differently than intravenous or oral corticosteroids in the bloodstream and in its effect on a person's immune system. I was troubled by some of the other aspects of the case, including that even though he does not have a criminal record, he's been in detention for two years. Does that not make this an unusual case, an extraordinary case, really? Your Honor, it's our position that it doesn't. Mr. Rosal has challenged the nature and length of his detention more than once in the district court. And he has actually won one of his previous petitions in part and is entitled by July of this year to receive a more individualized hearing on his continued detention status. And so the nature of this sort of motion, and again, they're so rare, but we're seeing them in this pandemic context, but they appear to be basic. Shouldn't we be considering what is a danger from respect to the virus? Also consider why the person is being retained, detained, and how much? I mean, the two things really go together. What is an extraordinary risk for one kind of person may not be sufficient for another one. Shouldn't we look at the whole thing together? Your Honor, again, there are so few of these cases, but I think you're right in saying that this is a totality of the circumstances sort of consideration. But I would say that the medical allegations that the petitioner is making are not supported by the record. And that bumps this case away from being an extreme circumstance in the way that they're arguing. Let me ask you another question. To opposing counsel, the presider said, aren't things easing up? I'd like to ask you both, are they easing up generally or is it in prisons that currently there is still much to be worried about? That is, it certainly has eased up in my state, for instance, but the guidelines that we had in my state are that prisons are now becoming what nursing homes were in an earlier part. Is that so? Your Honor, I don't think. Thank you. Your Honor, that's not supported by the declarations that I've received from the detention centers. There has been no, I've confirmed this today. There has been no new COVID cases in the detention center where Rosal is since April 20th. The facility is below 50% capacity to ensure that detainees can maintain social distance. Despite petitioner's contentions in their reply brief, detainees are required to wear masks anytime they are outside of their housing unit and all employees that interact with the detainees must wear masks at all times. And so not only has the detention center gotten better since the Jones litigation, but the detention center is a much safer place for Rosal to be than the epicenter of the pandemic, which remains in the United States to be in New York City. Could you just clarify one thing for me? So the status of the mask requirement is what with regard to prisoners? When I was looking at the Jones litigation, it seemed to me that people were inmates that were requested to wear masks, but it was not required. It's a very new requirement that they are now required to wear the mask, not all the time when they're outside of their housing unit. So anytime they go to court, anytime they go to a medical visit, anytime they leave their housing unit, they are required to wear a mask. I understood Mr. Rosal was housed in a dormitory style kind of open area where there was space for people, but where he could be then affected by someone else's mask wearing practices and be the victim of a transmission. Is that incorrect in that understanding? That's not incorrect, Your Honor. Correct. Okay. Yeah, sorry. That is more precise. One other quick question, if I could. I understood you to be representing that the incidence is low right now of COVID in this facility, but it was not clear to me what the testing rate was. Is everyone tested? Not everyone is tested. Every person that comes into the detention center, every new intake is tested and quarantined for 14 days, even if the test comes back negative. Otherwise, detainees are screened for symptoms and tested if they display symptoms. And any detainee, symptomatic or not, can request to be tested and they will be tested. What about the staff? Are they tested daily? Or how often are they tested? Your Honor, I don't know the answer to that question, but I would gladly, I can find out and file an amended statement from the director of the facility if you'd like. Well, yes, sure. Go ahead and you can do that. And then the other side can respond if it wishes. But I would do it relatively soon. Okay. I'll do it as quickly as I can. Thank you, Your Honor. And we'll hear the rebuttal. Thank you, Your Honor. A few quick points. First, on the method of administration of the Flunisolide, the government is correct that currently the CDC's guidelines do distinguish between different methods of administration of corticosteroids. I know that that is a recent update. As the government's medical declaration itself acknowledges, COVID-19 is still a new disease with evolving information. Thankfully, the CDC guidelines are not the only evidence that we have to this point. We cite cases, excuse me, not cases, we cite studies by the National Institutes of Health, namely the National Library of Medicine, that do not distinguish between the immunosuppressant effects of corticosteroids that are administered nasally versus in any other fashion. And one of those studies confirms that the specific corticosteroid that Mr. Estelle uses is absorbed into the circulatory system when it is administered nasally. On the point about his criminal history, we want to just reiterate that he has no criminal history. He has never been arrested. The government does not argue that he was a flight risk. Let me interrupt for just a second, please. I guess we have open still the question regarding the amended statement that has to do with medical information about the import of Mr. Estelle's white blood cell count. And if the panel decides to consider that, is that something you would want an opportunity to respond to on the substance as opposed to just the concerning filing of this at the very last minute? That is correct, Your Honor. I would say here that, you know, based on us having less than 24 hours to review it, we believe that Mr. Estelle would still prevail even if the court were to await that verified declaration. We would still believe that Mr. Estelle prevails. The government tries to make two new arguments, one on his white blood cell count and notably on his weight, which they don't actually mention in their affirmative motion. On the white blood cell count, the government puts forward a new CBC test from September 2019, long after Mr. Estelle had already began his corticosteroid therapy based on the studies that we cite. The relevant comparison are baseline levels, i.e., levels before a patient begins corticosteroid therapy to levels after the patient is on corticosteroid therapy, meaning that the fact that over the course of six months, someone's white blood cells haven't changed very much doesn't tell us anything about the import of that test. That's it. Thank you. Thank you. You did well over. The court will reserve decision. We'll move on to the day calendar.